# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

January 10, 2014

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Aleksander Efrosman*, CR 06-95 (NGG)

Your Honor:

I write in response to the government's sentencing memorandum and in response the Court's order indicating that it is considering an upward variance from the guideline sentencing range.

As noted in Mr. Efrosman's prior sentencing submission, the total offense level in this case should be level 28, which corresponds to a sentencing range of 97 to 121 months in criminal history category III. A sentence within that guideline range is sufficient to serve the interests of justice and the goals of sentencing; a more severe sentence would be greater than necessary to address those interests.

## Guideline calculation

Mr. Efrosman has objected to PSR ¶ 29, which recommends a 4 level enhancement because he "acted as a commodity pool operator." The bases of his objection is that foreign currency, traded on the spot market, is not a commodity under the Commodity Exchange Act and that the commodity pool operator enhancement is intended to apply only to high level officers and directors of commodity trading concerns. The government's response the this objection is that Mr. Efrosman waived his objection to this enhancement by not being specific enough in his objections to the PSR; that foreign currency, no matter how it is traded, is a commodity; and that the Court should read USSG §2B1.1(b)(18) broadly so as to encompass ordinary perpetrators of fraud such as Mr. Efrosman.

The government cites no case law, statute, or rule in arguing that Mr. Efrosman has waived his objection to the commodity pool operator enhancement by being insufficiently

specific in his objections to the PSR–likely because no such authority exists.  There is no legal reason that the Court should not reach the merits of this issue, despite the government's reticence.

The government's response to Mr. Efrosman's first contention– that foreign currency traded on the spot market is not a commodity under the Commodity Exchange Act (CEA)–is to ignore or mischaracterize the types of investments Mr. Efrosman advertised through AJR and Century Maxim.  In their advertising and other documentation, both AJR and Century Maxim clearly stated that trades were executed solely in the "spot market."[1]  As noted in Mr. Efrosman's prior sentencing submission, the CEA explicitly excludes currency as a regulated commodity except for contracts of sale for future delivery or options on foreign currency.  There exists no evidence that AJR or Century Maxim ever traded in future contracts or in options.  Quite to the contrary, the advertising and other documents created by the firms stated that trading was done only in the spot market.

The cases cited by the government in support of it's contention that currency is a commodity under the CEA no matter how it is traded are inapposite.  Judge Platt's decision in *Commodity Futures Trading Comm'n v. Int'l Foreign Currency, Inc.*, 334 F.Supp.2d 305 (E.D.N.Y. 2004) was based, at least in part, on his finding that the transactions in that case were not spot contracts because they had no settlement dates. *Id.*, at 311.  Here, there is no reasonable view of the evidence but that AJR and Century Maxim advertised that they transacted only in the spot market.  Also, Judge Platt relied on the fact that the investors in *Int'l Foreign Currency* were allowed to contract on margin, neither AJR or Century Maxim indicated that margin trades would be made.

In *United States v. Walsh*, 723 F.3d 802 (7th Cir. 2013), both defendants *stipulated* that their company "was a futures . . . trading company." *Id.*, at 811.  Furthermore, though some of the transactions conducted by the defendants in that case were spot sales, defendants conceded that their company "had some futures customers." *Id.*, at 812.  Unsurprisingly, the Circuit Court found under those circumstances, where the defendants admitted to trading in futures, that the commodity pool operator enhancement applied.  Again, there is no evidence in this case that AJR or Century Maxim ever traded in futures or options, or ever advertised such trades.

The most useful explanation of when a currency transaction is subject to the CEA is found in *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861 (7th Cir. 2004).  The

---

[1]Among documents received from the government in discovery is a "Century Maxim Fund Managed Currency Trading Account" pamphlet which states that Century Maxim specializes in "the strategic use of spot transactions in the foreign exchange market."  The same document lists as one of the features of the "managed currency trading account" that:  "[t]rades only occur with the most liquid currencies in the spot market."  A website advertising AJR, screen shots of which were received as discovery, stated that it "specializes solely in spot FX."

*Zelener* Court found that a futures contract "does not involve a sale *of the commodity* at all. It involves a sale *of the contract*." *Id.*, at 865(emphasis in original). Thus, since retail forex contracts call for the sale of the actual commodity–foreign currency–rather than the sale of a contract, the Court held that the retail forex transactions at issue to be spot sales outside the scope of the CEA. *Id., see also, Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 323-24 (6th Cir. 2008)(Recognizing that a futures exchange involves the trading of an agreement or contract.); *Sanders v. Forex Capital Markets, LLC*, 2011 WL 5980202 (S.D.N.Y. 2011)(Finding that plaintiff entered into spot transactions for foreign currency which were not futures contracts and that the CFTC thus lacked jurisdiction under the CEA.)

The default judgment obtained by the CFTC in *Commodity Futures Trading Comm'n v. Efrosman*, 2007 WL 2125775 (S.D.N.Y. July 6, 2007) offers little guidance to this Court. Because it was a default judgment, the court heard no evidence or argument from Mr. Efrosman and simply accepted the CFTC's position that AJR and Century Maxim offered "foreign currency futures contacts." As noted above, neither entity ever sold, or offered to sell, currency futures. As becomes clear after reading *Zelener, supra*, the CFTC is wont to overstate its jurisdiction over currency trading and claim jurisdiction over trading in the spot market, even though the CEA specifically limits CFTC jurisdiction to currency futures.

AJR and Century Maxim advertised that they bought and sold currency solely on the spot market. Neither company offered or advertised transactions in currency futures. Neither company ever traded in futures. Currency trades on the spot market are specifically excluded from the jurisdiction of the CFTC by the CEA. Thus, Mr. Efrosman is not a "commodity pool operator" as defined by USSG §2B1.1, comment. (n.14) and the CEA.

The government asks the Court to broaden the sweep of the commodity pool operator enhancement beyond that intended by the Sentencing Commission when it enacted the enhancement. As noted in Mr. Efrosman's prior sentencing submission, this enhancement was intended to apply to high ranking corporate officers or their equivalent–those who are subject to heightened fiduciary duties because of their positions. Such an enhancement is simply not applicable to the garden variety investment fraud committed by Mr. Efrosman. Mr. Efrosman's fraud was simply to offer an investment opportunity and then misappropriate investor's funds to his own use, he was not the equivalent of a corporate officer or even a stock trader who owes a heightened duty to shareholders or clients.

## 18 U.S.C. § 3553(a)

On November 21, 2013, the Court issued an order providing notice that it "is considering a variance in sentence above the Guideline range." The sentencing statute directs a sentencing court to consider the kinds of sentence and the sentencing range established in the Sentencing Guidelines as well as the need to avoid unwarranted sentence disparities among similarly situated

defendants.  18 U.S.C. § 3553(a)(4), (a)(6).  These directives obviously favor a sentence within a guideline range.  One of the most important goals of creating the Guideline Commission was to reduce sentencing disparities among similar defendants and that's why sentences within the guideline range are favored by the applicable sentencing statute.

Of course, the guidelines are only part of what a sentencing court must consider before imposing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  Other considerations include the necessity that a sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).  To arrive at a fair sentence, sentencing courts are further directed to consider the nature and circumstances of the offense and the history and characteristics of the offender and the need to provide restitution to any victims of the offense  *See* 18 U.S.C. § 3553(a)(1), (a)(7).

As noted above, portions of the 18 U.S.C. § 3553(a) clearly support sentences within the guideline range.  In this case, consideration of the other factors relevant to sentencing also justify a sentence within the guideline range.  It must be noted that a guideline sentence in this case could be as long as 10 years, a very significant period of imprisonment, especially for a man in his fifties in poor health with young children, one of whom has a serious, lifelong disability.[2]  A sentence within the guideline range is certainly meaningful punishment and would reflect the seriousness of the crime.

The Court should note that the government is also requesting a sentence within the guideline range.  Though the government anticipated a higher guideline range in its plea agreement, it now concedes that it's loss estimate in the plea agreement (a loss of greater than $7 million) was incorrect.  Over months of plea discussions, the defense urged the government to stipulate to an accurate guideline calculation.  These discussions were fruitless, as the government would not agree to a loss amount of less than $7 million, nor would it agree that the commodity pool operator enhancement did not apply.  The government's rigid position during plea discussions was confounding, as it had stated a loss amount of less than $7 million in official documents when requesting that Mr. Efrosman be extradited from Poland.  The government's position is still confounding, as it now agrees to a loss amount that it would not agree to in the plea agreement.  The effect of the government's mistaken loss amount in the plea agreement was to raise the appeal waiver in the plea agreement to the statutory maximum.

The guideline range takes into account Mr. Efrosman's criminal history.  Mr. Efrosman

---

[2]Attached as exhibit A is a photograph of Mr. Efrosman's children.

receives criminal history points because of his prior conviction and because he was on supervised release during the commission of the instant crime. Not only is his criminal history category enhanced because he was on supervised release when he committed the instant offense, he likely faces a substantial, consecutive sentence in the Southern District of New York for violating the terms of his supervised release. Under these circumstances, it is difficult to say that Mr. Efrosman's criminal history is insufficiently represented by his guideline range.

It is not Mr. Efrosman's position that he did not commit a serious offense, rather that the guideline range provides a serious but appropriate punishment for the offense. While accepting responsibility for his actions and conceding their serious nature, Mr. Efrosman is concerned that certain portions of the PSR, based on information provided by the government, provide the court with an unwarranted portrait of Mr. Efrosman and his history. For example, Mr. Efrosman has objected to inclusion of the "Panama fraud" in the PSR. The only evidence of this alleged fraud provided by the government is a declaration filed in a civil suit and a statement of the alleged victim provided to the Probation Department. The government's bare assertion that it has proved these allegations by a preponderance of the evidence is simply untrue. The defense has seen no corroboration of these allegations–not as much as a single bank record. Despite this, the government has made these disputed, unproven allegations a part of the sentencing record. Mr. Efrosman, therefore, requests that the Court "rule on th[is] dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing'' pursuant to Fed.R.Crim.P. 32(i)(3)(B).

The PSR, again based on information provided by the government, leaves a misimpression that Mr. Efrosman was engaged in a calculated plan to defraud investors, build his assets, and flee the country for his next fraud. In fact, the government is in possession of records which show that Mr. Efrosman spent approximately $3 million at casinos. This amount surely understates the amount of money Mr. Efrosman spent on gambling and alcohol during the relevant time period. Thus, the government's contention that Mr. Efrosman "used a substantial portion of the fraud proceeds to support himself and his family" after he left the United States is unsubstantiated. The hard truth for Mr. Efrosman is that as fast as AJR and Century Maxim took in money, he spent it, mostly on vices. He recognizes that there is little redeeming in that story, but he looks forward to trying to redeem himself day by day.

As noted above, the guidelines call for a significant term of imprisonment in this case. That range of imprisonment is appropriate considering Mr. Efrosman's crime. However, a more severe sentence would fail to recognize the real hardship Mr. Efrosman's family will suffer while he is incarcerated, the role played by his undiagnosed mental illness in his criminal conduct, his failing health, and the harsh nature of his confinement both in Poland and the MDC. A guideline sentence in this case is sufficient to serve the ends of justice and would keep Mr. Efrosman in prison to the age of 60 or beyond. A higher sentence is unwarranted and would be "greater than necessary" to serve the ends of justice.

Page 6 of 6
**United States v. Aleksander Efrosman**
January 10, 2014

Thank you for your attention to this matter.

Respectfully submitted,

Michael K. Schneider, Esq.
(718) 330-1161

cc:    Clerk of the Court [by ECF w/o exhibit]
       Mr. Daniel Spector, Assistant U.S. Attorney
       Ms. Sindee J. Haasnoot, Senior United States Probation Officer
       Mr. Aleksander Efrosman